Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for damages for several alleged breaches of contract by the Government. The contract in question called for the construction by the plaintiff of a large number of “hutments” or barracks, 10 lavatory buildings and a large messhall at the Air Forces Eeplacement Center Project at Jefferson Barracks, Missouri, which is near St. Louis.
The plaintiff’s project was one of several construction projects carried on at Jefferson Barracks by different contractors. The plaintiff’s contract was dated November 30, 1942; it required that work be commenced within three days after the receipt of notice to proceed; the notice to proceed was also given on November 30. The contract required a considerable part of the work to be completed by January 15, 1943, and the rest of it by February 1. It was a unit price contract, and the estimated total contract price was $264,117.95.
It is apparent that the plaintiff undertook to do an extensive building job in a few weeks in midwinter. In connection with several of its claims the plaintiff complains that it was not given extensions of time because of snow and some days of near zero weather. One wonders what kind of weather the plaintiff anticipated when it made the contract.
From the Government’s standpoint, the completion of the work on time was urgent. Troops by the thousands were coming into Jefferson Barracks and were being housed temporarily in tents. All the Government officers who supervised the construction were insistent, and it would seem, rightly insistent, that the work be finished on-time, if it was possible to do so. The contract did not contain a provision for liquidated damages for late completion.
*604 The Government was to furnish the lumber for the project or make allocations to the plaintiff from sources under Government control. At the beginning of the work, the Government had seventeen carloads of lumber available and' shortly supplied six more carloads. This was half of what would be required for the entire job. For the rest of the-lumber it took a lot of planning by the Government expediter-to keep lumber available, for it was scarce and in great demand. It came in by truckloads from wherever it could? be obtained. But it came in, and the plaintiff’s work was not seriously delayed by shortages of lumber. Some 2 x 4’s had' to be made by ripping 2 x 8’s, but the plaintiff was paid am éxtra for the cost of doing that.
The plaintiff complains of the quality of the lumber in the original 17 carloads furnished by the Government. The-dimension or framing lumber seems to have been all right.. But a large proportion of the boards were gum wood, which is harder to use in construction than most kinds of wood. We have concluded that the plaintiff’s labor costs in using-the inferior lumber were $10 more per thousand board feet,, and that the plaintiff was damaged thereby in the amount of $2,868.75.
The plaintiff says it was damaged by a shortage of nailsr which were to be furnished by the Government. Nails were scarce, and the supply sometimes ran low, but the work was not seriously impeded by the scarcity of nails.
Floor panels which had been dismantled at Scott Field, Illinois, were to be used in the 5-man hutments which the plaintiff was to erect. The Government was to deliver the panels to the site of the hutments. The plaintiff hauled eight of these panels and was paid $5 each for doing that. It claims that it hauled 246 more such panels, but the evidence does not show that it hauled more than the eight for which it was paid.
The plaintiff claims that it was damaged by not being able to pour parts of the concrete slab which was to be the floor of the large messhall. It says that if it could have done so, it would have had a dry, level platform on which to build the trusses, or frames, for the sides of the messhall, and would not have had to build them on the muddy ground. It says *605 that the reason it could not pour sections of the concrete slab was because the ditches dug for the placing of the sewer under the messhall could not be filled and the concrete slab placed •over them, until the sewer lines had been pressure tested. It says that the Government would not allow the sewer lines to be tested in sections, as it might have done, and hence no part of the ditches could be filled in, and no part of the concrete slab could be poured, until all the sewer lines under the ■messhall were constructed and tested.
The Government says that the plaintiff’s plumbing subcontractor refused to test the sewer in sections. A Government witness before the Board of Contract Appeals testified that if the sewer had been tested in sections before the “run-out” lines were placed, there would have been no way to test the runout lines when they were placed. There is no explanation in the record as to why this was not a good reason for refusing to permit the testing of the lines in sections, if it was not a good reason. There is also no explanation as to why the plaintiff’s subcontractor did not finish the sewer lines under the messhall so that they could be tested as a whole, if the delay in testing was causing damage to the plaintiff. The evidence on this claim is conflicting and incomplete, and does not persuade us that the Government was at fault.
Mr. Eugene B. Sydnor was the plaintiff’s superintendent on the contract work. Mr. Walter F. Sheehan was one of the partners of the plaintiff company, and spent much of his time at the job. By January 18, 1948, the messhall was closed in and the concrete floor was completely poured. On January 19, the temperature was five degrees below zero at 8 a. m. During the morning, Mr. Sheehan told Mr. Sydnor to discontinue operations on the entire project while the weather was so cold. There was work for many men in the messhall, which was heated, apparently by salamanders, and lighted. The Government’s representative seems to have ■ordered that the indoor work continue, for some men continued to work.
On January 20, the Government’s representative requested Mr. Sheehan to give up his pass to enter the job site, and Mr. Sheehan did so. The Government representative’s re *606 port to Ms superior said that Mr. Sheehan’s given reason for wanting to close down even the indoor work was that if any men at all worked, the plaintiff could not claim credit for days lost. Mr. Sheehan’s pass was restored in about a week. The plaintiff claims that its work suffered greatly in efficiency during Mr. Sheehan’s absence. There is no satisfactory proof as to how much, if any, loss of efficiency occurred. We therefore find it unnecessary to consider the question of whether the lifting of the pass was justified.
The plaintiff complains that it was not granted extensions of time on account of adverse weather conditions. It was required to work extra shifts and overtime to bring the work up to date, and if its time had been extended it would not have had to incur this extra expense. As we have already said in this opinion, a contractor who undertakes a rush job in midwinter must expect that he will lose some time on account of the weather, and must expect to have to make up that time somehow. The orders of the Government representative to work overtime and extra sMfts seem to us to have been well within his authority under the contract. The zero weather and snow did not prevent the soldiers from coming in to Jefferson Barracks nor make it unnecessary to construct facilities to house and feed them.
The plaintiff’s losses resulted, we think, almost entirely from the fact that it, apparently inadvertently, bid too low for the work. Its only meritorious claim is for $2,868.75, the extra cost of using the inferior lumber, and the $10 which was tendered with the final payment voucher and refused by the plaintiff. The plaintiff may have a judgment for $2,878.75.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
EINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes the following findings of fact:
*607 1. By a contract dated November 30, 1942, numbered W-1103-eng-4027, entered into on behalf of the defendant by Lieutenant Colonel L. B. Feagin, Corps of Engineers, War Department, and on behalf of the plaintiff, Ardmore Construction Company, a partnership having its principal office in St. Louis, Missouri, consisting of Walter F. Sheehan and John B. Gutmann, the plaintiff agreed to construct 468 5-man hutments, 20 15-man hutments, 10 lavatory buildings and 1 messhall, together with certain related work at the Air Forces Replacement Center Project at Jefferson Barracks, Missouri, on a unit price basis for 30 items of work plus an allowance, for allocated materials and equipment, all for an estimated total contract price of $264,117.95.
2. Thirty contract modifications were issued. The plaintiff was paid a total of $261,592.66, which represented all that had been found by the contracting officer to be due to the plaintiff except the sum of $10 which represented a final retention as to which the plaintiff refused to execute and submit a voucher. The total cost of the work to the plaintiff was $286,185.39, resulting in a net loss to the plaintiff of $24,592.73.
3. The partnership, consisting as has been shown of Walter F. Sheehan and John B. Gutmann, was formed on November 28, 1942, the date on which bids were opened, being the same day the Ardmore firm was advised that it was low bidder and that the contract would be awarded to it.
Thereafter, on December 18, 1942, John B. Gutmann and Joseph A. Sheehan, brother of Walter F. Sheehan, entered into an agreement by which Gutmann assigned, transferred and set over unto Joseph A. Sheehan “all of his rights in, under and to- that certain partnership agreement dated November 28,1942, * * * which partnership was organized for the purpose of carrying out and doing United States Government contract No. W-1103-Eng.-4027 * * By this assignment Joseph A. Sheehan was to receive all of that part of the income under the original partnership agreement which was to have been paid to Gutmann, and Joseph A. Sheehan agreed to protect Gutmann and save him harmless from claims or losses. Mr. Gutmann was to continue to *608 render certain services to the Ardmore Construction Company at a stated salary of $50 per week. Walter F. Sheehan indicated his acceptance of such terms by his signature on the assignment agreement. The assignment agreement referred to herein is in evidence as plaintiff’s exhibit 5 and is hereby incorporated as a part of this finding.
Joseph A. Sheehan operated a plumbing firm under the name of J. Sheehan Plumbing Company and was a subcontractor of Ardmore under the contract in suit.
4. The contract required the contractor to commence work within three days after receipt of the notice to proceed, to •prosecute the work with faithfulness and energy, and to complete all 5-man hutments and lavatories in the north area by January 15, 1943, and the remainder of the work, including clean-up, by February 1, 1943.
5. The notice to proceed was received by the contractor on November 30, 1942. Work commenced on that same day.
It thus appears that this plaintiff undertook to perform a •60-day contract with much of the work to be completed in 45 days under the weather conditions normally to be expected •during December and January at St. Louis, Missouri.
6. Six bidders submitted bids under the contract negotiation. Their bids, together with the Government estimate, are shown below:
1. Dickie Construction Company-$314,617.60 317 North 11th Street St. Louis, Missouri
2. E. A. Brunson Construction Company_ 295, 651.50 4052 Forest Park Boulevard St. Louis, Missouri
3. L. O. Stocker Company_ 309,377.00 1610-11 Arcade Building St. Louis, Missouri
4. Ardmore Construction Company_ 264,117.95 Wainwright Building St. Louis, Missouri
5.I. E. Millstone Construction Company_ 279,224.00 4343 Clayton Avenue St. Louis, Missouri
6.G. Kehl Sons_ 334,778.50 1225 North Maplewood Chicago, Illinois
Government Estimate*_ 312,753. 50
7. The contract contained the following provisions, among -others:
*609 Article 4. -Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
*****
Article 1. Materials and workmanship. — Unless otherwise specifically provided for in the specifications, all workmanship, equipment, materials, and articles incorporated in the work covered by this contract are to be of the best grade of their respective kinds for the purpose. * * *
Article 8. Superintendence by contractor. — The contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the contracting officer, on the work at all times during progress, with authority to act for him.
Article 9. Delays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to *610 proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the_ work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated under this Article or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government (including, but not restricted to, any preference, priority or allocation order), acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes ox delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
* * * * *
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision *611 or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this Article. The contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. The president of the board, from time to time, may divide the board into divisions of one or more members and assign members thereto. A majority of the members of the board or of a division thereof shall constitute a quorum for the transaction of the business of the board or of a division, respectively, and the decision of a majority of the members of the board or of a division shall be deemed to be the decision of the board or of a division, as the case may be. If a majority of the members of a division are unable to agree on a decision or if within 30 days after a decision by a division, the board or the president thereof directs that the decision of the division be reviewed by the board, the decision will be so reviewed, otherwise the decision of a majority of the members of a division shall become the decision of the board. If a majority of the members of the board is unable to agree upon a decision, the president will promptly submit the appeal to the Under Secretary of War for his decision upon the record. A vacancy in the Board or in any division thereof shall not impair the powers nor affect the duties of the board or division nor of the remaining members of the board or division, respectively. Any member of the board, or any examiner designated by the president of the board for that purpose, may hold hearings, examine witnesses, receive evidence and report the evidence to the board or to the appropriate division, if the case is pending before a division. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the Contractor under the provisions of this Article shall be paid by the United States as part of the cost of the articles or work herein contracted for and shall be deemed to be within the contemplation of this contract.
*****
Article 21. Definitions. — (a) The term “head of the department” as used herein shall mean the head or any assistant head of the executive department or independent establishment involved, and the term “his duly au *612 thorized representative” shall mean any person or board authorized to act for him other than the contracting officer.
(I>) The term “contracting officer” as used herein shall include his duly appointed successor or his authorized representative.
8. The contract specifications contained the following provisions, among others :
1-06. Commencement, prosecution and completion. — (a) The contractor will be required to commence work under the contract within 3 calendar days after date of receipt by him of notice to proceed, to prosecute the said work with faithfulness and energy, and to complete all 5-man hutments and lavatories in the North area by January 15,1943, and the remainder of the work by February 1, 1943. The dates set for completion of each of the above phases of work shall include final cleanup. All hutments in the North area shall be completed before work in the South area is begun.
(i) When the contractor is delayed in performing the work through no fault or negligence on his part, as a result of uncompleted work by others, the time allowed for completion of such delayed work will [be] extended by a period of time equal to the period of such delay, as determined by the C. O.
(e) If the completion of the undertaking to be performed under the terms of this contract be delayed by reason of delay in the delivery of materials or supplies essential to such performance because of war priorities and without the fault or negligence of the contractor, the time of performance will be extended for a period equal to such delay, as determined by the C. O., and subject to appeal, as provided in Article 9 of the contract. A priority rating of AA.-3 will be assigned to the contract to facilitate procurement of materials and supplies essential to the performance of the work.
(d) No liquidated damages will be prescribed in case of failure on the part of the contractor to complete the work within the time thus determined and agreed upon for completion.
* H: * * *
1-12. Abbreviation and definitions. — (a) Abbreviations used in these specifications refer to the following:
C. Q. — Contracting Officer
U. S. — United States
Fed. Spec. — Federal Specifications
*613 Letter “E” before Fed. Spec, number denotes Emergency Alternate Specification. These specifications are modifications of the basic Federal Specifications, designed to conserve critical materials.
(b) Definitions. — Wherever in the specifications or upon the drawings the words directed, required, permitted, ordered, designated, presmbed, or words of like import are used, it shall be understood that the direction, requirement, permission, order, designation, or prescription of the contracting officer is intended, and similarly, the words approved, acceptable, satisfactory or words of like import shall mean approved by or acceptable to, or satisfactory to, the contracting officer, unless otherwise expressly stated.
9. Work was completed on the items of work and the buildings were turned over to the defendant on the following days:

Date Unite Type

Jan. 21,1943_ 16 15-man butments
Jan. 30, 1943_178 5-man butments
Feb. 1, 1943_ 2 Lavatories
Feb. 2, 1943_240 5-man butments
Feb. 5, 1943_ 4 15-man butments
50 5-man butments
7 Lavatories
1 Messball
Feb.' 12, 1943_ 1 Lavatory
The plaintiff was paid an additional amount pursuant to a contract modification for completing eight of the 15-man hutments earlier than originally required.
10. The plaintiff contends that the defendant breached its contract in ten instances whereby plaintiff was damaged in the sum of $45,805.02. Plaintiff’s claims are itemized below:
1. Failure to furnish lumber as needed.
2. Failure to furnish lumber in accordance with specifications.
3. Failure to furnish nails as required for the work.
4. Failure to properly deliver or store floor panels.
5. Failure to allow testing of sewer lines in sections.
6. Obstruction to the work caused by the drilling of troops in roadways.
7. The exclusion of Walter F. Sheehan from the site of the work.
8. Failure to grant extensions of time on account of adverse weather conditions.
*614 9. The direction to the plaintiff to work labor overtime and on extra shifts.
10. An alternative claim relating to the failure to grant requested extensions of time.
11. During the period of construction and subsequent to the completion of the contract, the plaintiff submitted numerous claims in connection with the work under the above-described contract. All of these claims were investigated by the Area Engineer, St. Louis, as the contracting officer. Some of them were allowed by said contracting officer and some were disallowed. The final decision of the contracting officer in connection with all disallowed claims of the contractor was made by letter dated October 25, 1943, and the final estimate was sent at that time to the contractor for acceptance.
12. On November 22, 1943, the contractor appealed from the decision of the contracting officer to the Secretary of War, pursuant to Article 15 of the contract.
13. On January 15,1944, the contracting officer at Kansas City made findings of fact in connection with plaintiff’s claims.
14. On January 20,1944, the District Engineer forwarded the findings of fact relating to plaintiff’s appeal to the Chief of Engineers together with a memorandum setting forth the District Engineer’s recommendations regarding the various claims.
15. In transmitting the findings of fact the District Engineer stated that “It is believed the alleged excessive costs were due entirely to the contractor’s work being poorly organized and supervised.”
16. On November 22,1943, the plaintiff filed an “Application for Price Adjustment and Renegotiation.”
17. This application was a request by plaintiff for relief under the First War Powers Act from losses allegedly sustained under Contract No. W-1103-eng-4027. It was transmitted on May 15, 1944, to the Chief of Engineers by the District Engineer with the recommendation that relief not be granted.
18. On May 29, 1944, the Office of the Division Engineer at Omaha, Nebraska, addressed a letter to the Office of the Chief of Engineers pointing out that:
*615 1. Attention is invited to the fact that the inclosed “Application for Price Adjustment and Benegotiation” filed with the District Engineer by the Ardmore Construction Company is identical with the amount claimed by the contractor in the last item of a pending appeal, from the decision of the Contracting Officer and is predicated upon the same facts and circumstances. * * *
On June 13,1944, the Office of the Chief of Engineers held:
2. Upon the basis of the information now appearing in the file, this office concurs in the view that relief under the First War Powers Act does not appear to be appropriate. However, no final decision can be made at this time as the appeal involving this same question is still pending before the Board of Contract Appeals.
19. On December 30, 1944, the War Department Board of Contract Appeals issued its opinion in the appeal of plaintiff under Contract No. W-1103-eng-4027.
20. The opinion points out that the plaintiff had appealed from the denial of 13 separate claims totaling $22,404.49 and had asserted an additional claim for total losses and anticipated profits in the amount of $56,822.04. Claims Nos. 1, 8, and 12, totaling $1,363.70 were settled prior to the hearing on the appeal.
The Board made the following disposition of the claims:
a. The appeal is denied as to Claims No. 2 ($1,063.20, less $265.34 paid thereon), No. 7 ($1,230), and No. 10 ($924.68, less $639.11 paid thereon).
b. The appeal is sustained as to Claims No. 3 ($955.93), No. 4 ($100), and No. 6 ($135.21), and to the extent hereinbefore indicated as to Claims Nos. 9 and 11.
o. The appeal is dismissed as to Claims No. 5 ($676.25) and 13 ($13,622.12), with special findings of fact as set forth herein, and without expressing opinion on the question of the Government’s liability for damage.
d. The file will be returned to the Chief of Engineers for determination of proper adjustments of the contract price, in conformity with the views expressed herein, with respect to Claims No. 9 ($1,195.92) and No. 11 ($2,041.93).
e. The appeal is dismissed without prejudice with respect to the claim under the First War Powers Act, 1941, and is denied as to the claim under Section 17 of the Contract Settlement Act of 1944.
*616 21. In its supplemental opinion dated March 16,1945, the Board of Contract Appeals referred the claim for relief under the First War Powers Act to the Chief of Engineers along with the other two previously referred to him. The three claims sustained by the Board and the two claims referred back to the Chief of Engineers in the original opinion were paid.
22. By letter dated June 26, 1945, the District Engineer, Colonel Neff, proposed to the plaintiff in settlement of the remaining claim referred to his office the payment of $12,-653.68 on condition the plaintiff release all of its claims under the contract, including claims for breach of contract. The plaintiff rejected that proposal.
23. Subsequently, by letter dated August 8,1945, the plaintiff was requested to sign a 14th and final payment voucher for $10 which plaintiff did not sign and which remains unpaid.
24. Under date of September 18, 1945, the Chief of Engineers informed the Board of Contract Appeals that he was unable to reach any agreement regarding relief under the First War Powers Act and that under date of August 15, 1945, authority for further submission of petitions for relief under the First War Powers Act had been revoked.
25. In a second supplemental opinion dated September 28, 1945, the Board reinstated its opinion of December 30,1944, thereby dismissing the claim under the First War Powers Act, and disposed of all of plaintiff’s other claims for the reasons and to the extent originally set forth in the Board’s opinion of December 30, 1944.
26. All of the plaintiff’s claims for damages set forth in its petition were submitted to the contracting officer who rendered a written decision on October 25, 1943, which was appealed to the Secretary of War.
27. As a result of the appeal, the Board of Contract Appeals, the designated representative of the Secretary of War, rendered its written decision and two supplements thereto.
FAILURE TO FURNISH LUMBER AS NEEDED
28. The contract contains the following provision, among others:
*617 Article 26. Loading and v/nloading cars. — Tlie contractor shall load promptly all railroad cars furnished for loading upon his order and shall unload from railroad cars promptly upon arrival all shipments consigned to him, and shall provide storage facilities and other facilities necessary for these purposes; and the contractor shall not order railway cars for loading unless they can be loaded promptly and shall not cause or permit shipments to be consigned to him unless they can be unloaded from railroad cars promptly upon arrival.
The specifications provide in part as follows:
SECTION II — MATERIALS AND EQUIPMENT TO BE ALLOCATED AND TO BE FURNISHED BY THE UNITED STATES
2-01. General. — The Government will furnish to the contractor certain materials and equipment, and designate the sources of, and allocate to the contractor certain other materials, and/or equipment all as hereinafter specified. It is the intent of the United States, in so doing, to furnish or locate materials and/or equipment for the contractor which might otherwise prove difficult to procure and thus delay the job.
In the event the contractor finds that he is unable to procure materials or equipment (other than those specified to be allocated or furnished by the Government) to complete the job within the specified time, he shall notify the C. O. in writing, stating that he has made every effort to procure said materials or equipment and shall give delivery dates promised by the sources of his choosing. This notification shall be submitted to the Office of the District Engineer, St. Louis, Missouri Engineer District, 800 U. S. Courthouse and Customhouse, St. Louis, Missouri, attention of the Progress Section, Allocation Unit, within 10 days after he has received notice to proceed with the work. Upon receipt of such notification from the contractor the United States will render assistance in locating a source of such materials and equipment, in which case the contractor should keep in mind that the source located by the U. S. will not always be the cheapest but will give the earliest shipping date.
All equipment to be furnished by the Government will be delivered f. o. b. the carrier at the job site. The contractor shall make arrangements to handle, unload, store and protect such equipment upon arrival at no additional expense to the Government.
*618 2-02. Materials to be allocated. — (a) The United States will designate the source or sources of and allocate to the account of the contractor, the materials and equipment listed below in sufficient quantities to construct the buildings, utilities, and appurtenances set forth in the contract or in any addition or additions thereto. The materials and equipment to be thus allocated in the name of the contractor shall be purchased by the contractor from the designated source and shall be installed by the contractor. The respective amount of money to be included in the contract price to cover the cost of the materials and equipment allocated to the contractor, and also to cover the freight charges to the railhead nearest the job site, are as listed below. The total amount as set forth below is included as the amount under the last item of the form of informal offer. The unit prices stated in the form of informal offer for other items shall not include any costs for furnishing the following materials and equipment f. o. b. railhead nearest the job site.
1* Lumber_$60, 000.00
H« Hi ❖ H? Hi
Notes. — 1* The lumber allocated as prescribed hereinbefore -will In* elude all requirements for formwork, temporary work, and all permanent construction ; except that millwork. plywood, wood fibre insulating board, and items of similar nature are not included in the materials to be allocated and such materials shall be procured by the contractor from sources of supply of his own choice.
$ $ $ H¿ ‡
(b) The United States will furnish the contractor lists showing in detail the amounts, sizes, etc. of the materials and equipment for which the United States proposes to designate the source of supply. The contractor shall check these lists and report in writing within 5 days any discrepancies which he finds, between the lists furnished by the United States and his own lists, so that any such discrepancy noted may be adjusted. (It is understood and agreed that the lumber list submitted shall conform to the conditions set forth in subparagraph 2-02 (f) titled “Special Lumber Requirements”.)
Any additions or adjustments to these lists required to complete the work shall be requisitioned by the contractor at least >80 days prior to the date delivery is desired.
(c) The materials and equipment to be delivered from sources designated by the Government will be supplied in accordance with the delivery schedule set up by the Office of the District Engineer.
*619 (d) Notwithstanding the fact that the Government designates the sources of supply of allocated materials and equipment and requires the contractor to make purchase of allocated items from that source, nevertheless the contractor shall be responsible for the rigid inspection of such materials and equipment entering into the construction work and shall be responsible for the removal and replacement of defective items not complying with the specifications without additional cost to the Government. When the materials and/or equipment arrive at the nearest railhead, the contractor shall accept such shipment and shall make all necessary arrangements for its unloading, handling, storage and protection, and for its transportation to the job site so that congestion of transportation facilities will be held to a minimum. No change in the schedule of the deliveries of materials or equipment shall be made without prior authority from the Office of the District Engineer.
* * * * *
(/) Special lumber requirements. — (1) The contractor shall be held responsible that the cutting of the lumber _ furnished by the Government be done in an economical manner.
(2) Lumber is usually allocated at lumber auctions held in key cities. When lumber is allocated after the contract is let, the contractor shall have his representative present at such auction for the purpose of signing purchase orders as the lumber is purchased. The contractor’s representative shall be present at the expense of the contractor.
‡ ‡
The contractor shall not alter in any way, the full provisions of the Carpentry Section of this specification. No restriction may be placed upon the species, sizes or grades shown in these specifications with a view to securing items which the contractor likes or those which save him money. All possible latitude must be used to widen sizes and increase the number of species and grades in accordance with these specifications in order to increase the available supplies of lumber.
(4) The contractor shall build temporary construction shanties and temporary structures of number three common grades, both for boards and dimensions.
29. The plaintiff was notified to commence work under the contract on November 30, 1942. The lumber needed for starting this job was available at the project on November 30, 1942, the day on which the contract was signed. From *620 December 1, 1942, through December 8, 1942, 28 cars of lumber, containing about 50 percent of the lumber needed on the job, were shipped by the Government to plaintiff for use under contract No. W-1103-eng-4027.
30. Following delivery of the first 17 cars of lumber the Government did, in accordance with the requirements of Section 2-02 (b) of the specifications, furnish the plaintiff with a list of lumber when it gave notice of the arrival of additional carload shipments. The Government’s expediter notified plaintiff of the kind of lumber being shipped in by truck.
31. The contract drawings provided that 2 x 3’s were to be used only in roofs of 5-man hutments. The first cars of lumber received contained no 2 x 3 lumber. Plaintiff was authorized on December 5,1942, to secure 2,000 2 x 3’s from a local lumber company. Plaintiff had no facilities for the fabrication of the 5-man hutments until December 15,1942.
32. On January 4, 1943, the assistant to the Acting Area Engineer confirmed instructions authorizing plaintiff to purchase locally 150,000 board feet of 4" and wider T & G No. 2 Y. P. random lengths. During the progress of the job lumber was constantly being received by plaintiff from defendant.
33. Plaintiff did not use any substantial quantity of lumber during the first three weeks of the contract despite the fact that it had an abundant supply of dimensional lumber available during that period.
34. The plaintiff was notified soon after it started the job that much of the 2x4 lumber would be shipped in as 2 x 8’s. Plaintiff was subsequently paid for cutting 2 x 8’s into 2 x 4’s. Plaintiff had plenty of 2 x 8’s during a several-week period when 2 x 4’s were short. Kipping of the 2 x 8’s caused no delay in the construction job.
35. Sufficient lumber was available on December 14, 1942, to carry out the increased work requested by the contracting officer.
36. During the period when it was very difficult to obtain lumber, the defendant’s engineers kept plaintiff supplied with lumber. The plaintiff’s operation of the job was never shut down due tó a shortage of material. There was never any over-all lack of lumber on the plaintiff’s job. There *621 were no instances where shortages of materials held back the progress of the job as a whole. At no time was plaintiff completely out of lumber. Momentary shortages of lumber were rectified within an hour or two, or at least on the same day.
37. It was part of the duties of Mr. Sydnor, the plaintiff’s superintendent, to keep defendant’s expediter fully advised at all times of plaintiff’s need for lumber.
38. Men were falling over each other at times on this job. Gutmann protested to Sydnor regarding the high labor cost. Sydnor pointed out that all of plaintiff’s foremen had the right to hire and that they had been instructed to do so. More men than necessary were put to work fabricating trusses.
39. Plaintiff’s estimate of damage is speculative and conjectural, and the evidence is insufficient to support a claim on account of failure to furnish lumber as needed.
40. This contention was one of the bases for Claim No. 13 before the Board of Contract Appeals. That claim was held by the Board to be in the nature of a claim for Un-liquidated damages for breach of contract over which it had no appellate authority. The Board dismissed it. However, the Board made special findings of fact in connection with this claim. A similar claim was presented for relief under the First War Powers Act of 1941 and Executive Order No. 9001. When no agreement could be reached with plaintiff, authority for further submission for relief under the Act was revoked. The claim under the Act was dismissed by the Board.
"FAILURE TO FURNISH LUMBER IN ACCORDANCE WITH THE SPECIFICATIONS
41. The pertinent provisions of the specifications relating to the claim for damages due to the alleged failure to furnish lumber in accordance with the specifications are as follows:
(d) Use, grade amd species. — Unless otherwise specifically indicated on drawings, lumber for various Uses shall be one of the following specified species and grades:
Note. — White oak shall not be used ior any purpose.

*622
TJsb Grade Species Special Requirements

(1) Sheathing, sub- No. 1 Common, flooring. T & G wall covering. Window flaps. Western Red Cedar Douglas Fir West Coast Hemlock Port Orford Cedar Sitka Spruce White Fir (W. C. L. A.)
No. 2 Common. Southern Pine Eastern Spruce Redwood Cypress Eastern Hemlock
No. 3 Common. White Pine Norway Pine Ponderosa Pine Larch Englemann Spruce Lodgepole Pine (W. P. A.) White Fir (W. P. A.)
No. 2 construction boards.. Aspen Basswood Chestnut Cottonwood Magnolia Willow Red Gum Sap Gum Black Gum Tupelo Buckeye Yellow Poplar
(2) Framing lumber, No. 2 dimen-2" nominal sion_ thickness. Any species specified in (d) (1) unless otherwise specifically indicated on the drawings.
(3) Planking 2" No. 2 dimen-thick. sion_ Any species specified in (d) (1).
• * * ♦ *
(6) Flooring. No. 1 Common. Eastern Hemlock Douglas Fir Sitka Spruce West Coast Hemlock Port Orford Cedar
No. 2 Common. Southern Pine Cypress
No. 3 Common-Norway Pine White Pine Larch Eastern Spruce Engelmann Spruce Ponderosa Pine Lodgepole Pine (W. P. A.)
No. 2 Common. Oak Pecan Tupelo Gum
3d Grade. Beech Birch Maple
*623 (e) Re-use. — Form lumber undamaged by previous use, if of required thickness, may be used, for subfloors, and where unexposed on the interior of the building, for roof sheathing, provided that all nails are withdrawn and surfaces are thoroughly cleaned.
Re-use of 'present tent frame hmiber. — The lumber dismantled from the present tent frames shall be used to the greatest extent possible as determined by the C. O.
42. Included in the first 17 cars of lumber which was furnished by the defendant to the job was a large quantity of gum lumber of an inferior grade which did not meet the specification requirements. The District Engineer, who was contracting officer, found in June 1945 that 286,875 board feet of such lumber was erected by the plaintiff and that $10 per thousand feet was a fair price for the erection of such inferior lumber. The evidence supports both figures. The plaintiff was damaged, therefore, in the sum of $2,868.75.
FAILURE TO FURNISH NAILS AS REQUIRED FOR THE WORK
43. The pertinent provisions of the specifications are:
2-03. Materials and equipment to be furnished by the united states. — The United States will furnish to the contractor certain materials and equipment in quantities listed below. These materials and equipment will be furnished to the contractor free of charge, and shall be installed by him at no additional expense to the Government. Any additional materials or equipment required to complete the installation shall be furnished by the contractor from sources of his own choosing and shall be installed at no additional expense to the Government.
(a) Nails. — The United States will furnish nails in sufficient quantities to construct the buildings, and all other work. It is understood and agreed that the nails furnished do not include nails for shop fabrication of mill work, and any other items which will be delivered to the job in a fabricated condition, nor does it include special nails for use in installing insulation board, roofing, and items of similar nature. Any such nails shall be furnished by the contractor from sources of his own choosing at no additional expense to the government. The contractor will be held responsible for economical use of nails furnished to him by the government. Nails not used at the completion of the job shall remain on the job and shall be turned over to the C. O. for storage.
*624 44. Plaintiff kept no record of its daily inventory and supply of nails. Sydnor’s diary, which, was relied upon by plaintiff, does not contain any information regarding the amount of nails on hand. The diary refers only to the receipt of nails and does not refer to delays due to shortage of nails. Plaintiff’s witness, the supervisor of the work on the mess-hall, Mr. Gutmann, knew .of no shortage of nails on the job. Mr. Morrison, the defendant’s expediter, did not recall any specific time when sufficient nails were not available. Captain Monfort, the Assistant to the Area Engineer, had no recollection of a shortage of nails.
45. There was no mention made of delay caused by a shortage of nails during the actual time this work was being performed. No claim for damage due to shortage of nails was made until after the contract had been completed.
46. Plaintiff’s estimate of damage is speculative and conjectural, and the evidence is insufficient to support a claim for failure to furnish nails as needed.
47. This contention was one of the bases for Claim No. 13 before the Board of Contract Appeals. That claim was held by the Board to be in the nature of a claim for unliquidated damages for breach of contract over which it had no appellate authority. The Board dismissed it. However, the Board made special findings of fact in connection with this claim. A similar claim was presented for relief under the First War Powers Act of 1941 and Executive Order No. 9001. When no agreement could be reached with plaintiff, authority for further submission for relief under the Act was revoked. The claim under the Act was then dismissed by the Board.
FAILURE TO PROPERLY DELIVER OR STORE PLOOR PANELS
48. The pertinent provisions of the contract specifications relating to this claim are:
1-03. general description. — (a) Five-Man Hut-ments. — It is proposed to construct 468 five-man hut-ments, 362 of which shall be located in the North area and 106 in the South Tent area as shown on drawing No. JB-18/13.
The North area in which the 362 hutments are to be constructed is now clear of existing buildings. These *625 362 hutments shall be constructed before any work is done on the hutments in the South Tent area.
The 106 hutments in the South Tent area will be constructed at the site of existing tents, and prior to the construction of the hutments, the contractor shall dismantle the existing tent frames and remove the existing floors and piers from the site. The unused portions of the dismantled frames and the entire floors and piers thus removed shall be placed adjacent to the area at a location directed by the C. O.
The floors for all of the five-man hutments shall be reused floors which were previously erected at Scott Field, Illinois, in accordance with Drawing No. 700-153, and which will be disassembled and transported to Jefferson Barracks by others. Each floor will be disassembled in three parts and sufficient floors for the construction of all hutments in the particular area will be stored adjacent to the area. The contractor shall construct new piers wherever required by the C. O. in order to provide a level floor, and shall re-erect the used floors for all five-man hutments to be constructed under this contract.
The hutments to be erected on the re-erected floors shall be wood frame structures with wood wall covering to a height of 4 feet above the floor and with screen wire or plastic screen above the siding as shown. The screen portion of the hutments shall be provided with wood flaps. The roof shall be dismountable and shall consist of wood sheathing covered with roll roofing. Heating facilities now provided for the existing 106 tents shall be re-installed in the proposed new hutments in the South Tent area. New heating facilities will be provided by the Government for the 362 hutments in the North area and installed by this contractor.
❖ He H« ❖ *
SECTION YIII — CARPENTRY
8-01. GENERAL. * * *
(h) Present tent construction. — (1) The Government will deliver to the hutment areas five hundred 16' x 16' used squad tent floors that were originally built according to enclosed drawing No. 700-153. These floors are relatively new and are in good condition. There will be no tent frames with the 500 tent floors. These 500 floors will not require new finish floors; 468 of these floors shall be used in constructing the 5-man hutments; and the remaining shall be used in constructing 10 of the 15-man hutments.
*626 (2) There are 106 16' x 16' squad tent floors with frames for tents on the South Area Site. The present tent frames shall be disassembled and suitable portions thereof reused as specified- in paragraph 8-02 (e). The unused portions of the frames and all of the floors of the units shall be removed and piled as directed by the C. O. on the area site.
(3) Ten of the 15-man hutments (to be used for administration buildings) shall be built on floors assembled from the 16' x 16' units the Government has delivered to the site. The floors of these shall be constructed according to details 1 and 4 of sheet 800-416. The remaining 15-man hutments shall have new floors which shall be built according to details 3 and 2 on sheet 800-416.
49. The location of 50 5-man hutments was changed so that they were built at the CCC area instead of at the south tent area. The contractor hauled eight floor panels from the south tent area to the CCC area and was given a separate purchase order for this work at $5 for each panel or a total of $40. The plaintiff here claims that it hauled an additional 246 floor panels to the CCC area. It is not established by the proof that any floor panels were hauled by the plaintiff other than the eight panels mentioned above. Three such panels were needed for each of 50 hutments constructed in the CCC area. Thus, only 142 (in addition to the eight) were used In the construction of the 50 hutments in the CCC area.
failure to allow testing of sewer lines in sections
50. The pertinent provisions of the contract specifications relating to this claim are:
13-23. Test, cleaning and adjustment. — (a) General. — All soil, waste, vent, and water piping shall be tested by the contractor, and approved by the C. O. before acceptance. Any soil or waste piping located underground shall be tested before backfilling. All equipment required for test shall be furnished hy the contractor without additional cost to the U.S. At the completion of the work this contractor shall be responsible for turning over a perfect working plumbing system, free from all defects, leaks and stoppages. All fixtures shall be washed clean, valves, piping, fittings, and any other part of this work shall be left in clean *627 condition. Flush valves and all automatic equipment shall be adjusted for proper operation.
(b) Dramage system. — The entire drainage and venting system shall have all necessary openings plugged to permit the entire system to be filled with water to the level of the highest vent stack above the roof, and hold this water for 80 minutes without showing greater than 4" drop. Where a portion of the system is to be tested, such test shall be conducted in the same manner as described for the entire system, except a vertical stack 10' 0" above the highest horizontal line to be tested may be installed and filled with water to maintain sufficient pressure, or a pump may be used to supply the required pressure. The pressure shall be maintained for 30 minutes. If and when the C. O. decides an additional test is needed, such as an air or smoke test on the drainage system, the contractor shall perform the same as part of this contract.
(c) Water system. — At the completion of roughing-in before setting fixtures, the entire hot and cold water piping system shall be tested at a hydrostatic pressure of not less than 100 pounds per square inch, and proved tight at this pressure. Where a portion of the water piping system is to be concealed before completion, this portion shall be tested separately in a manner described for the entire system.
51. In the construction of the messhall, plaintiff planned to have the sewers in first, then to lay the concrete slab for the floor, then to proceed to assemble the trusses and raise them in place, and then to finish the sheathing and roofing.
52. It is customary in buildings of the type of the messhall to proceed immediately with the construction of the footing, foundations, exterior walls and roof, leaving the interior work and floor slab for the final operations.
53. While there is sharp conflict in the evidence concerning whether or not the defendant’s representative allowed or would have approved of the testing of the sewer lines for the messhall, it is found that the delay in applying the test to the sewer lines was occasioned by the refusal of the plaintiff’s subcontractor to test the lines in sections.
54. This claim was presented for relief under the First War Powers Act of 1941 and Executive Order No. 9001. "When no agreement could be reached with plaintiff, authority for further submission for relief under the Act was revoked. *628 The claim under the First War Powers Act was dismissed by the Board of Contract Appeals.
OBSTRUCTION TO THE WORK CAUSED BX THE DRILLING OP TROOPS IN ROADWAXS
55. The pertinent provision of the contract specifications relating to this claim is:
1-19. Kight-op-wax. — Grounds and right-of-way at the site of the work will be provided at no expense to the contractor.
56. Drilling of troops was taking place during a 2- to 3-week period in December 1942 while the plaintiff was engaged in the contract work. At that time there were 15,000 to 20,000 men stationed at Jefferson Barracks and many of them were engaged in drilling during the normal workday. Streets and roads in and around the area where the contract work was performed were to some extent used for the drilling of troops, and this caused some obstruction to the movement of the plaintiff’s trucks as well as to men who had to cross such streets and roads as it would be necessary to wait for a break in troop movements for trucks and men to get across.
57. No claim was made on account of the obstruction to the work by reason of the drilling of troops in the roadway until june 4, 1945.
58. Although the plaintiff was damaged by such troop drilling, it has not established the amount of such damages by satisfactory proof.
THE EXCLUSION OP WALTER P. SHEEHAN PROM THE SITE OP THE WORK
59. The pertinent contract provision relating to this claim is:
Article 8. Superintendence by contractor. — The contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the contracting officer, on the work at all times during progress, with authority to act for him.
60. Although Walter F. Sheehan, one of the partners of the plaintiff firm, spent a good part of the time at the site *629 of tbe work, Eugene B. Sydnor was employed by the plaintiff and recognized by the defendant’s representatives as the contractor’s superintendent.
61. On January 8, 1943, the Acting Area Engineer wrote to the plaintiff that the progress on the messhall and latrines was behind schedule. The plaintiff was, by this letter, directed to work 24 hours a day on those two items of work. This direction also included the work of subcontractors.
On January 9,1943, the plaintiff replied to the above-mentioned letter stating that a copy of it had been sent to each of its subcontractors. The letter continued:
In reference to the carpenter work on the messhall and lavatory buildings we wish to state that we have gone practically as far as it is possible for us to go until we receive the materials that are holding us up, namely the insulation board and millwork. Your Mr. Morrison has been trying to facilitate the delivery of this material and we understand that it will be in St. Louis Monday or Tuesday of the coming week (January 11 or 12). As soon as we receive this material we will put a bunch of men on these buildings with the idea of rushing them to completion.
By January 15,1943, the messhall was closed in and two-thirds of the concrete floor was poured. By January 18, 1943, the concrete floor had been completely poured.
62. On the morning of January 20, 1943, Lieutenant Ahrens, the contracting officer’s representative, called upon Walter Sheehan to give up the identification card (without which he could not enter the Jefferson Barracks Beservation), and this was done; and Sheehan was escorted to the gate of the reservation by Lieutenant Ahrens. This resulted from a dispute between Sheehan and the Lieutenant over whether or not operations on the entire project should be discontinued because of cold weather.
63. On the morning of January 19, 1943, the temperature was 5 degrees below zero at 8 a. m., and gradually increased to 7 degrees above zero by midnight. On the morning of the 19th Walter Sheehan told Eugene Sydnor, the superintendent, to discontinue operations on the entire project while the weather was so cold. This came to Lieutenant Ahrens’ attention, and apparently as a result of his statements made *630 to either Sheehan or Sydnor, some of the men worked as is indicated by the entry in the superintendent’s diary for that day.
64. On January 22,1943, Mr. Sheehan wrote the following letter to the Area Engineer at St. Louis:
As orally advised you two days ago, Lt. Ahrens, inspector on the construction job, which is being constructed by Ardmore Construction Company, of which I am a partner, at Jefferson Barracks, contract No. W-1103-eng-4027, over my protest and without any justifiable reason or cause insisted that I turn over to him my pass to the reservation or he would have me ejected from the reservation and from the construction job.
Naturally I had no alternative but to surrender my pass. Upon the surrender of my pass I was ejected from the reservation personally by Lt. Ahrens, and from my work at the Barracks. On the same day I requested of you the return of my pass and to date Í have not heard from you with reference to this. Naturally all of this construction work is under my personal supervision, and as long as I am prevented from going on the reservation, by reason of lack of my presence there which will inevitably result in a loss to my company, and for which we propose to hold the Government responsible.
I find nothing in the contract, or any authority in the specifications, whereby I am prevented from personally supervising the contract which our company has with the United States Government. I deem this action highly arbitrary, contrary to the terms of the contract, without authority, and in view of the fact that I have not heard from you as to whether or not this pass is to be returned, this is my written request to you to immediately remedy this situation by forwarding me a pass and instructing your inspector to honor the same.
Inasmuch as I have not heard from you, I am forwarding a copy of this letter to Kansas City in order that immediate action can be secured thereon. It is not that I wish to do this by going over your head, but it seems like this is the only alternative open to me to properly safeguard my company from further loss in this contract.
In this connection, we have, since the start of this contract, made a number of claims and protests, and only one of which we have received a ruling from your office. May I request that we promptly hear from you as to these claims.
*631 65. On January 23, 1943, Lieutenant Ahrens directed the following memorandum to the Acting Area Engineer at St. Louis:
1. On Wednesday, January 20th, 1943, at approximately 10 A. M., the undersigned requested that Mr. Walter F. Sheehan, Partner of the Ardmore Construction Company, relinquish his Pass and remove his presence from the job site in particular and the Jefferson Barracks Reservation in general effective immediately.
2. In initiating such action the undersigned was motivated by Mr. Sheehan’s non-cooperative spirit, examples of which are well known to the Area Engineer. The crowning act on Mr. Sheehan’s part precipitating this drastic action occurred on Tuesday, January 19th, when Mr. Sheehan ordered his Superintendent, Mr. Sydnor, to discontinue operations on the entire Project for the duration of the cold weather. Mr. Sheehan’s reasons for such action was the fact that he could not claim credit for days lost time if any of his employees were working on any part of the job. This seemed extremely ridiculous in view of the fact that the men working were undercover in the Mess Hall which was heated and lighted thus enabling the men to work in comfortable surroundings.
66. On January 25, 1943, the District Engineer wrote the following letter to the plaintiff to the attention of Walter F. Sheehan:
I am in receipt of a carbon copy of your letter of January 22nd addressed to Major Saenger, my representative in St. Louis, under whom you have a contract at Jefferson Barracks, Missouri.
I regret very much to learn that our Resident Engineer felt called upon to request the surrender of your pass to the Job at Jefferson Barracks. However, he states in his justification therefor that you ordered your Superintendent to discontinue operations on the entire Project for the duration of cold weather. In view of the fact that the great majority of the men working were under cover in a Mess Hall, which was heated and lighted, this action appeared rather arbitrary and certainly not in the best interests of the Government, which needs this Job soon. In addition to this, your partner in this venture still has access to the Job and is in complete charge thereof and is making a very good showing in spite of your absence from the Job, according to our Daily Progress Reports.
*632 Inasmuch as it appears, first, that you were removed from the Job for causing delay, and, second, that your firm is represented by your partner and that the Job is still completely under the supervision of the company with whom the Government contracted, it appears to me that it will be necessary for you to show good reason for the necessity of returning your pass.
If I am misinformed as to the real facts in this case, or if you feel that you can present a real reason for the necessity of your presence on this Job, I shall be delighted to reconsider this case, in view of the additional information submitted, if, when, and as you lay it before me.
I am, as I said before, deeply regretful that any such occurrence as this should have taken place, but inasmuch as a contract is so close to completion and the venture is apparently being ably supervised by your partner, I trust that this hasn’t inconvenienced you to such an extent that it will need cause either of us further concern.
I have instructed Major Saenger to take action on your claims and protests to date, so that we may bring your contract up to date.
67. Mr. Sheehan thereafter went to Kansas City and spoke to the District Engineer, and as a result, his identification card was restored so that he could again enter the reservation and give his personal attention to the work.
68. Although the plaintiff claims that it was damaged by the above-described incident, plaintiff’s superintendent, when called as a witness for the plaintiff, stated on direct examination that he did not know of any effect on the work of the plaintiff’s labor caused by the “taking up of Mr. Sheehan’s pass.”
It is found that no damage resulted to the plaintiff by reason of the exclusion of Walter Sheehan from the job for one week.
failure TO GRANT EXTENSIONS OF TIME ON ACCOUNT OF ADVERSE WEATHER CONDITIONS
69. Although the contract did not provide for the payment of liquidated damages for delays, the Delays-Damages Article (Article 9, see finding 7) provided that the defendant might terminate the work if the contractor refused or failed to prosecute the work with such diligence as to insure *633 completion in the time specified. Since the contracting officer might order additional shifts and Saturday and Sunday work to bring the work up to schedule (see next finding), the plaintiff requested extensions of time due to weather conditions. This would have had the effect, if granted, of extending the completion dates of the contract work.
70. On January 2,1943, the plaintiff wrote to the defendant requesting an extension of time of three days due to rain, stating that the men could not work.
On January 15, 1943, the Acting Area Engineer replied, denying the requested extension and stating that the records showed that the plaintiff worked a normal crew of men on those three days.
On January 16, 1943, the plaintiff wrote to the defendant stating that on Friday morning (January 15) it rained and the men working were forced to lay off at 10 a. m. Credit for this day was requested (in the form of an extension of the contract time).
On January 25, 1943, the plaintiff wrote the following letter to the Area Engineer:
Credit for time on the above contract is hereby requested as follows:
Tuesday, January 19th, the men were unable to work on the outside projects due to a temperature of 5 degrees below zero. Men working on the inside of the Mess Hall were ordered by Lt. Ahrens to work under the most unfavorable conditions at a loss of about 50% efficiency.
Wednesday, January 20th, with the thermometer 2 degrees above zero, Lt. Ahrens directed the crew in the Mess Hall to work under unfavorable conditions with a loss of about 40% efficiency, and on the outside work, he directed that they proceed starting about ten o’clock in the morning.
Credit for this time together with the unnecessary expense is fair and reasonable, and should receive favorable consideration.
71. The contracting officer made findings of fact on January 15, 1944, holding in effect that the weather during the contract period was not abnormal for that time of the year in St. Louis.
*634 72. This matter came before the War Department Board of Contract Appeals which, in dismissing the appeal as claims for unliquidated damages with special findings of fact, stated in connection with the weather:
g. The evidence establishes that except for a heavy snowfall early in December 1942, the weather during the period in question was not more severe or unfavorable, either as to temperature, snowfall, or rain, than the average weather conditions as shown by official weather records over a period of approximately 70 years. There was an exceptionally heavy snowstorm on 5 December 1942, and the snow was not melted for several days; this was unusually severe weather for the time and place.
h. There were excusable causes of delay for which extensions totaling 15 days should have been granted by the contracting officer under the “Delays-Damages” clause (Art. 9) of the contract. The completion dates should, therefore, have been extended for the five-man hutments and the lavatories in the north area from 15 January 1943 to 30 January 1943, and as to the remainder of the work from 1 February 1943 to 15 February 1943. The excusable causes of delay were principally the heavy snowfall of early December 1942, changes in the work, and difficulties in delivery and quality of lumber allocated by the Government.
73. The findings of the Board concerning the weather conditions are supported by substantial evidence. The period of worst weather was at the beginning of the contract work.
74. December 5, the day of the exceptionally heavy snowstorm, was a Saturday. There is no evidence that any work was done by the plaintiff on either that Saturday or on Sunday, December 6. The Weather Bureau monthly meteorological summaries for both December 1942 and January 1943 show that on Saturday, December 5,1942, there was 5.2 inches of unmelted snow on the ground at 6:30 p. m. at St. Louis, Missouri. On Sunday, December 6 at the same time of day, there was 4% inches, and on Monday, December 7, there was 3y2 inches, with 3 inches on Tuesday, December 8. By December 9 there was only y2 inch of snow on the ground.
75. There is no satisfactory proof of the plaintiff’s damage as a result of the exceptionally heavy snowfall described above.
*635 The plaintiff’s total payroll from the beginning of the work to December 9,1942, was $1,411.23.
THE DIRECTION TO THE PLAINTIFF TO WORK LABOR OVERTIME AND ON EXTRA SHIFTS
76. The pertinent provision of the contract relating to this claim is:
Article 11. Bight-hour law — Overtime compensation — Oonvict labor. — (a) No laborer or mechanic doing any part of the work contemplated by this contract, in the employ of the contractor or any subcontractor contracting for any part of said work contemplated, shall be required or permitted to work more than eight hours in any one calendar day upon such work at the site thereof, except upon the condition that compensation is paid to such laborer or mechanic in accordance with the provisions of this article. The wages of every laborer and mechanic employed by the contractor or any subcontractor engaged in the performance of this contract shall be computed on a basic day rate of eight hours per day and work in excess of eight hours per day is permitted only upon the condition that every such laborer and mechanic shall be compensated for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay. For each violation of the requirements of this article a penalty of five dollars shall be imposed upon the contractor for each laborer or mechanic for every calendar day in which such employee is required or permitted to labor more than eight hours upon said work without receiving compensation computed in accordance with this article, and all penalties thus imposed shall be withheld for the use and benefit of the Government: Provided, That this stipulation shall be subject in all respects to the exceptions and provisions of U. S. Code, title 40, sections 321, 324, 325, and 326, relating to hours of labor, as in part modified by the provisions of section 303 of Public Act No. 781, 76th Congress, approved September 9,1940, relating to compensation for overtime.
*1» »j» sfe H*
The pertinent provisions of the specifications relating to this claim are:
1-10. Existing utilities. — * * *
(b) Electricity. — Telephone service or electric current required by the contractor shall be furnished at the ex *636 pense of the contractor from the nearest available connection at the site. The voltage available is 120-240, single phase, 60 cycle. The contractor shall install, at his own expense, a current meter to determine the amount of current used by him on the work, and to be paid for by him at prices of the cost of said electric power to the U. S. Any temporary connections to the electric power lines required and any temporary lines to the construction site shall be furnished and installed by the contractor and shall be made and maintained in such a manner as in the opinion of the C. O. will eliminate all danger to workmen or visitors at the site of the work. After temporary lines have served their purpose, the contractor shall remove them, including all connections, to the satisfaction of the C. O. The contractor shall consult with the Post Utilities Officer concerning the use of and cost of utilities, etc.
‡ * 3: * *
1-14. Saturdays, Sundays, holidays, and nights.— Work shall be carried on during all week days, and work on Saturdays, Sundays, holidays, and nights will be required whenever considered justified in the opinion of the C. O. to bring work up to schedule in order to complete it within the time specified. In such event the C. O. will notify the contractor in writing within a reasonable time in advance thereof. Operations carried on at night shall be subject to the provisions of subpara-graph 1-24 (c) hereof.
1-22. Organization, plant and progress.— * * *
(b) Progress chart. — The contractor shall submit for approval of the C. O., a chart within five days after the date of award indicating the volume of work to be done and the rate of progress which he agrees to maintain for the various phases of work.
This chart shall be in the form of plotted bars representing the time in days for each feature of work included in the contract. Various types of buildings will require a separate chart also separate charts will be required to be submitted for outside utilities which indicates a breakdown into main items or features of work. Each item or feature of work will be weighed to represent percentages which are based on estimated contract quantities. Samples of forms of these bar charts will be furnished the apparent low negotiant at the time of receiving offers. In preparing the chart, due allowance shall be made for probable delays caused by inclem *637 ent weather. Attention is directed to the requirement that work under the contract must be prosecuted as vigorously as practicable during all seasons of the year and a progress chart which does not indicate such operation will not be considered satisfactory.
(c) The contractor shall employ an ample force of properly experienced men and provide construction plant properly adapted to the work and of sufficient capacity and efficiency to accomplish the work in a safe and workmanlike manner at the rate of progress stated on his progress chart. All plant shall be maintained in good working order and provision shall be made for immediate emergency repairs. No reduction in the capacity of the plant employed on the work shall be made except by written permission of the C. O. The measure of the capacity of the plant shall be its actual performance on the work to which these specifications apply. Award of this contract shall not be construed as a guaranty by the Government that plant listed by the contractor for use on this contract is adequate for the performance of the work.
(d) Should the contractor fail to maintain the rate of progress proposed on his progress chart, the C. O. may require that additional men, working if necessary during additional periods or shifts (see also paragraph 1-14), or additional plant, or both, be placed on the work; or that a reorganization of plant layout be effected in order that the progress of the work may be brought up to schedule and so maintained, all without additional cost to the Government. Should the contractor refuse or neglect so to increase the number of men, working periods, or plant, or to reorganize the plant layout, the C. O. may terminate the contractor’s right to proceed with the work or such part of the work on which there has been delay pursuant to the provisions of Article 9 of the contract.
77. This contract numbered W-1103-eng-4027 was dated November 30, 1942. It covered a rush construction job. The specifications provided that 5-man hutments and lavatories in the north area should be finished by January 15, 1943, and the remainder of the work was to be completed on February 1, 1943.
78. Lumber allocated by the Government was available in quantities at the job site on December 1, 1942. However, the sawmill, which was to be put up by the plaintiff, was not completely ready until December 15, 1942.
*638 79. On December 9, 1942, the Engineer in Charge wrote the following letter to the plaintiff:
You are hereby directed, effective immediately, to work ten (10) hours per day, seven (7) days per week on all phases of work under your contract which are delaying the completion of the job.
These extra hours of work are ordered under provisions of paragraph 1-22 (d) of the specifications. You acknowledged receipt of notice to proceed on November 30, 1942 and to date very little work has been accomplished. To date your progress schedule has not been received, but it is obvious that the present rate of progress is far less than that necessary at this stage of the work to complete the job on time.
These extra hours of work will be at no additional cost to the Government.
80. On or about December 12, 1942, a progress chart was submitted by plaintiff. It was weighted as follows: 5-man hutments 35.46%, 15-man hutments 6.57%, water and sewers 8.28%, latrines 30.28% and messhall 19.41%. According to this progress schedule the contractor proposed to complete approximately 2% of the total contract within the first ten days thereof, whereas at the end of that period only approximately 1% of the work had been accomplished. On December 28,1942, the actual amount of work completed was 16%, and the amount scheduled for completion was 36%. ' To reflect the rate of progress necessary to complete the contract on the date specified, the work was rescheduled on December 28, 1942, and the contractor was advised that the revised schedule must be maintained.
81. On December 14, 1942, the Engineer in Charge wrote the following letter to the plaintiff:
As the work under your contract is behind schedule you are directed, effective immediately, under provisions of paragraph 1-22 (d) of the specifications, to work twenty-four (24) hours per day, seven (7) days per week, until the work under your contract is on schedule.
82. On December 17, 1942, the Engineer in Charge wrote two letters to the plaintiff as follows:
Reference is made to letter of this office dated December 14, 1942, directing that the work under your contract No. W-1103-eng-4027 be prosecuted on a twenty- *639 four (24) hour per day, seven (7) day per week basis.
To date this directive has not been complied with, even though all preparations for night lighting were completed on Tuesday, December 15,1942.
Information is requested as to why the directive, referred to above, has not been complied with and as to when you intend to begin complying with this directive.
*í» ^ % •!*
It is the belief of this office that the progress of the work under your contract has suffered severely because of lack of proper and adequate supervision. The superintendent employed on the job is not satisfactory to this office in that capacity.
It is directed, that under the terms of Article 8 of your contract, that, by Monday, December 21, 1942, you employ a superintendent, satisfactory to this office, to supervise the work under this contract. This superintendent shall have the authority to act for you in the conduct of this work and shall be on the job at all times during its progress.
83. On December 19, the plaintiff wrote the following letter to the Engineer in Charge:
Receipt is acknowledged of your letter dated December 17, 1942, advising that under date of December 14, 1942, you wrote ordering this company to prosecute the work under such contract on a basis of 24 hours per day, 7 days per week, and now asking you be advised the disposition of this company in complying with your demand.
In reply to such letter this company submits that under the terms and conditions of such contract Lt. Col. L. B. Feagin is the duly authorized contracting officer; that such contracting officer has not ordered this company to work 24 hours a day, 7 days per week, nor has this company received notice that such contracting officer has delegated such authority to issue such orders, or that a successor has been appointed. This company has not been advised that you are the successor contracting officer or that such authority has been delegated to you, and therefore under the terms and conditions as outlined cannot feel that this is a proper order.
In further answer to such demand we submit that such action is arbitrary, unreasonable, unwarranted,, and not justified by either law or'fact.
In support of such statement we submit the following facts.
*640 Such order was not issued in accordance witbi the terms and conditions of the contract and is therefore null and void.
This office has been unable to determine your desires inasmuch as this writer conferred with you on Monday, December 14,1942, the same date as the ietter previously mentioned, and you, at that time informed this writer that it would not be necessary to work 24 hours a day 7 days a week.
This company submits that the letter dated December 14, 1942, is so vague and indefinite that we are at a loss to know what you want or what portions of the work you wished prosecuted on such a basis.
We submit that your letters of December 14 and 17, 1942, regarding such hours of work are contradictory, inasmuch as in your letter dated December 14, 1942, you at that time ordered that such work be prosecuted 24 hours a day 7 days a week, “effective immediately”, while in your letter dated December 17, 1942, on the same subject you admit that lights for such operation were not ready until December 15, 1942.
We submit that on both December 14, 1942, and December 17, 1942, this company was entitled to extensions of time under such contract because of delays occasioned through no fault of and beyond the power of this company to prevent and that had such extensions of time been granted we would not have been on either dates previously mentioned, and still would not be behind the established progress set up in our schedule.
To date we have been conducting operations under this contract under very adverse conditions with which you are quite familiar, and in so doing have expended considerable extra money in attempting to comply with your requests.
Request is therefore made if you have such authority to furnish this office with a copy of it. This writer will be happy to confer with you in regard to the extensions of time to which we are entitled, and requests that after such adjustment is made in regard to extension of time to which we are entitled, you still have a valid reason to make such request you inform me of it in writing.
84. The plaintiff refused to carry on the work on a 24-hour basis and also refused to employ a new superintendent. The plaintiff never worked his men on a 24-hour basis. From December 3 through December 28, operations were conducted on a single 8-hour shift. From December 29, 1942, through *641 February 10, 1943, a double shift of 8 hours each was operating. From February 11, 1943 to the end of the work a single 8-hour shift was used.
On various occasions the Engineer in Charge directed that work be conducted on Saturdays and Sundays.
85. The overtime and shift work ordered by the representative of the contracting officer outlined above was necessary to complete the work within the contract period. The work was completed except minor clean-up items by February 12 (see finding 9).
AN ALTERNATIVE CLAIM RELATING TO THE FAILURE TO GRANT EXTENSIONS OP TIME
86. The pertinent provisions of the contract relating to this claim are:
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
$ $ $ * *
Article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
87. The contracting officer issued change orders to compensate the plaintiff in connection with claims it made for *642 extra work. During the course of the work 30 change orders were issued. Each change order provided that: “It is understood and agreed that on account of the foregoing modification of said contract, no additional time will be allowed.”
88. The Board of Contract Appeals found that plaintiff’s claims for damages based on the weather, the quality and quantity of materials allocated to the job and changes in the work were in the nature of claims for unliquidated damages for breach of contract and for wrongful acts of Government representatives which neither the Secretary of War nor the Board had appellate authority to determine. The Board dismissed these claims but in accordance with a directive in a memorandum of the Secretary of War, made special findings of fact which are, so far as here material, quoted in finding 72.
89. The plaintiffs made repeated written requests for extension of time, none of which were granted. Because of the findings of fact of the War Department Board of Contract Appeals referred to above, the plaintiff in effect charges a breach of contract by the defendant in not having during the course of the contract work, extended the contract completion dates by 15 days.
DAMAGES
90.In an application for price adjustment and renegotiation submitted by the plaintiff on November 22,1943, one of the bases upon which such application was premised is quoted below:
The evident error of the contractor in this negotiated contract in bidding far below the Government estimates on said contract in the unit price thereon, that the fair and reasonable estimates of said contract which should have been bid by contractor are as follows, based on our costs:
* * # & ‡
There followed a listing of the various unit prices which totaled $310,829.43. This compares with the price bid by the plaintiff of $264,117.95, which became the contract price.
*643 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two thousand eight hundred seventy-eight dollars and seventy-five cents ($2,878.75).

Based on a fair and reasonable cost (-without profit) to an experienced and well-equipped contractor of doing the work by contract.